**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Application of<br><br>ALPINE PARTNERS (BVI) L.P.,<br><br>Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | Case No. 24- |

**DECLARATION OF MARK CHUDLEIGH IN SUPPORT OF THE APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

I, Mark Chudleigh, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a barrister and attorney and have been licensed to practice law in Bermuda since 1992.  I have been admitted as a barrister (1990) and solicitor (1992) of the courts of England and Wales and to the state bar of California (1998).  I am managing partner in the Bermuda law firm Kennedys Chudleigh Limited ("Kennedys") which is part of Kennedys Law LLP, a full-service international law firm which currently has 46 offices around the world.  In the United States, Kennedys has offices in New York, New Jersey, Pennsylvania, Illinois, Texas, Florida, California, and Delaware.

2.      I completed my legal education at the University of Kent at Canterbury in the United Kingdom in 1990 and at the Inns of Court School of Law in London, United Kingdom in 1991.  Thereafter I practiced law in London and Bermuda before moving to Bermuda full-time in 2008.  Prior to moving to Bermuda full time, in 2006 I established a Bermuda law firm that subsequently became Kennedys Bermuda.  My practice focuses on commercial and corporate litigation, with matters that often span multiple jurisdictions (including the United States).  I have

handled various share appraisal disputes before the Bermuda courts, including arising out of the compulsory purchase of shares from minority shareholders.  I have also provided expert testimony on issues of Bermuda commercial and corporate law in matters pending before the courts of various jurisdictions, including state and federal courts in the United States.  I have been recognized by The Legal 500 and by Chambers Global (2018–2020) as a leading Dispute Resolution, Insurance and Reinsurance, and Trusts lawyer in Bermuda.

3.      Kennedys represents Petitioner Alpine Partners (BVI) L.P. ("Petitioner"). Petitioner is one of the plaintiffs in the appraisal proceeding (the "Appraisal Proceeding") before the Supreme Court of Bermuda (the "Bermuda Supreme Court").  The Appraisal Proceeding has been brought by two shareholders (together, "Dissenting Shareholders"), including the Petitioner, to determine the fair value of their former shareholdings in Myovant Sciences Ltd. ("Myovant" or the "Company"), the shares of which were compulsorily purchased by Sumitovant Biopharma Ltd. ("Sumitovant"), the Company's majority shareholder, in a merger which became effective on 10 March 2023 (the "Merger").[1]  For the purpose of the present application, I am also authorized to make this declaration on behalf of APS Holding Corporation, another Dissenting Shareholder in the Appraisal Proceeding.  Petitioner's Application is supported by all Dissenting Shareholders.

4.      The Respondent is a commercial partner of the Company, with a substantial financial interest, and therefore will possess information relevant to the value of the Company. The Petitioner believes that, prior to the Merger, the Respondent had expressed an interest in purchasing the Company.  Therefore, information revealing details of the Respondent's offers, and its valuations of the Company's shares, will be relevant to the Appraisal Proceeding.

---

[1] In June 2023, a further merger took place whereby the Company merged into Sumitovant. Effective 20 June 2023, Sumitovant changed its name to Sumitomo Pharma UK Holdings, Ltd. Sumitomo Pharma UK Holdings, Ltd is now the Defendant in the Appraisal Proceeding.

5.     To the extent the contents of this declaration are within my personal knowledge, they are true and accurate.  To the extent the contents are not within my personal knowledge, they are true to the best of my current knowledge, information, and belief.

6.     Throughout the course of my declaration, I refer to several judgments of the Bermuda, Cayman Islands, and English courts, as well as the Rules of the Supreme Court of Bermuda ("RSC"), true and correct copies of which are appended as Exhibits 1–22:

(a)     *Golar LNG Limited v. World Nordic SE*, [2011] Bda L.R. 9 (Ex. 1);

(b)     *Re Qihoo 360 Technology Co. Ltd.*, 2017 (2) CILR 585 (Ex. 2);

(c)     *Re Integra*, FSD 92 of 2014 (Unreported 28 August 2015) (Ex. 3);

(d)     *Re Qunar Cayman Islands Limited*, 2018 (1) CILR 199 (Ex. 4);

(e)     *Re Nord Anglia Education, Inc.*, CICA 24 of 2017 (Unreported, 17 March 2020) (Ex. 5);

(f)     *Re Trina Solar Limited* (Unreported, 23 September 2020) (Ex. 6);

(g)     RSC Order 24, rules 1 and 3 (Ex. 7);

(h)     RSC Order 32 rule 7 (Ex. 8);

(i)     *Panayiotou v. Sony Music Entertainment (UK) Ltd.*, [1994] Ch. 142 (1993) (Ex. 9);

(j)     *NetBank v. Commercial Money Centre*, [2004] Bda L.R. 46 (Ex. 10);

(k)     *The Patriot Group, LLC v. Hilco Financial, LLC and others*, [2015] Bda L.R. 46 (Ex. 11);

(l)     *South Carolina Insurance Co. v. Assurantie Maatschappij*, [1987] A.C. 24 (Ex. 12);

(m)     *Dreymoor Fertilisers Overseas Pte Limited v. Eurochem Trading Gmbh & Ors*, [2018] EWCH 2267 (Comm) (Ex. 13);

(n)     *Apex Fund Services Ltd and anor. v. Matthew Clingerman and anor*, [2019] SC (Bda) 74 Corn (Ex. 14);

(o)     *Hiscox v. Yuval Abraham*, (2018) Bda L.R. 88 (Ex. 15);

(p)     *Lyxor Asset Management S.A. v. Phoenix Meridian Equity Limited*, [2009] CILR 553 (Ex. 16);

(q)     *Re Nord Anglia Education, Inc.*, FSD 235 OF 2017 (Ex. 17);

(r)     *Re Trina Solar Limited*, CICA (Civil) Appeal No. 009 of 2021, dated May 4, 2023 (Ex. 18);

(s)     *Jardine Strategic Holdings Limited* [2021] SC (Bda) 87 (Ex. 19);

(t)     *Walter Tzvi Soriano v (1) Forensic News LLC (2) Scott Stedman [2023]* EWHC 262 (KB) (Ex. 20);

(u)     *Compagnie Financière et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55 (Ex. 21) ; and

(v)     *Myovant Sciences Ltd* [2023] SC (Bda) 67 (Ex. 22).

## I.     The Merger and the Appraisal Proceeding

7.      Petitioner and other Dissenting Shareholders were shareholders of the Company prior to their shares being compulsorily purchased in March 2023 by Sumitovant, the Buyer.[2] Petitioner is an investment fund constituted as a limited partnership in the British Virgin Islands.

---

[2] Capitalized terms not defined herein have the meaning ascribed to them in the accompanying Memorandum of Law and the Proxy Statement attached as Exhibit 2 to the concurrently filed Declaration of Duane L. Loft.

8.     The Company is a biopharmaceutical company registered in Bermuda, which, prior to the Merger, was publicly listed on the New York Stock Exchange under the ticker symbol MYOV.

9.     On January 23, 2023, the Company filed a proxy statement ("Proxy") with the Securities Exchange Commission detailing its proposed merger with Sumitovant which, if approved by the shareholders, would result in the Company being taken private and with the shares of minority shareholders, including Petitioner, being compulsorily purchased at a price of $27 per share.   The Proxy is attached to the Declaration of Duane Loft as Exhibit 2.   The Buyer, Sumitovant, was, at the time, the majority shareholder of Myovant, owning approximately 51.5% of the outstanding Myovant shares.

10.    On February 27, 2023, the Dissenting Shareholders filed Originating Summonses in the Supreme Court of Bermuda against Myovant seeking a determination of the fair value of their respective shares in Myovant under Section 106(6) of the Companies Act of 1981.  A true and correct copy of the Originating Summonses is attached hereto as Exhibit 23.

## II.     Scope of Discovery in the Appraisal Proceeding

11.    Shareholder appraisal proceedings in the compulsory purchase context in Bermuda have, to date, been less common than in other jurisdictions, such as the Cayman Islands and Delaware.  For that reason, Bermuda case law surrounding appraisal proceedings is comparatively less developed.   However, because the Cayman Islands is, like Bermuda, a British Overseas Territory (sharing both the same ultimate court of appeal, the Privy Council based in London, and also some common judges) and, like Bermuda, is an offshore financial center, the Bermuda Supreme Court will look to Cayman Islands law as persuasive authority in the absence of Bermudian or English precedents on a particular issue of law.  Decisions of the Privy Council are

binding on the lower Bermuda courts.  English law—from which Bermuda derives its common law system—is considered highly persuasive.  Furthermore, decisions of the Supreme Court of the United Kingdom or "UKSC" (formerly known as the House of Lords) are generally considered to be *de facto* binding on the Bermuda Supreme Court and are thus followed, in part given the stature of the UKSC and in part because the judges that sit on the UKSC concurrently sit on the "Judicial Committee" of the Privy Council, the highest appellate court for Bermuda, the Cayman Islands, and other British Overseas Territories.  However, as England does not have a statutory provision similar to Section 106(6) of Bermuda's Companies Act of 1981, the Bermuda Supreme Court is more likely to take into account decisions from the Cayman Islands in relation to shareholder appraisal proceedings (in the compulsory purchase context) as the Cayman Islands has a similar statutory provision in the form of Section 238 of the Cayman Islands Companies Act.

12.     A Bermuda judge will not consider himself or herself to be an expert in share valuation.  Instead, the judge will be guided by the valuation experts appointed by the Company and by the Dissenting Shareholders, who will provide their expert opinions and testimony on the fair value of the Dissenting Shareholders' shares.  *See, e.g.*, *Golar LNG Limited v. World Nordic SE* [2011] Bda L.R. 9, Ex. 1 ¶¶ 8–9 (which concerned a fair value appraisal under Section 103 of the Act, relating to short-form mergers).  The *Golar* court observed that it should consider "all the relevant information that is put before it" regarding valuation.  *Id.* ¶ 5.

13.     Similarly, I am aware from my professional experience that the Cayman Islands courts—whose procedural rules are very similar to those of the Bermuda courts—have repeatedly emphasized that "[t]he sole task of the Court is to determine the fair value of the dissenters' shares.  To do that, it needs full information."  *Qihoo 360 Technology Co. Ltd.*, 2017 (2) CILR 585, Ex. 2 ¶ 19.  Indeed, the Cayman Islands court in *In the Matter of Integra*, FSD 92 of 2014 (Unreported

28 August 2015), Ex. 3 ¶ 21, quoted from and implicitly approved a decision of the Court of Appeal of British Columbia where it was held that "the one true rule is to consider all of the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on all of the evidence and all the factors."  In addition, the Cayman Islands courts have recognized that documents in the hands of persons other than the company are very often relevant to the question of fair value.  *See, e.g.*, Re *Qunar Cayman Islands* 2018 (1) CILR 199, Ex. 4 ¶¶ 65, 74–75.

14.     Therefore, in assessing the fair value of the Dissenting Shareholders' shares, the Bermuda Supreme Court will consider all of the evidence submitted by the parties concerning their competing views on the fair value of the Company's shares.  This would include evidence relating to the fairness (or lack thereof) of the process that led to the Merger.  I am aware that the "deal process" is often considered by Cayman Islands courts when determining fair value.  For example, such an analysis was undertaken by the Cayman court in *Re Nord Anglia Education, Inc.*, CICA 24 of 2017 (Unreported, 17 March 2020), Ex. 5.  In *Nord*, the Cayman Islands court considered several conduct-related factors when considering the reliability of the deal price as a guide to the fair value of the dissenting shareholders' shares, including: (a) whether the transaction process "had been carried out in good faith" (¶¶ 114(a) and 125); (b) the motivations of the 'Baring Funds' who had interests on both the buy and sell sides of the transaction (¶ 114(b)); (c) the manner in which conflicts were managed (¶ 126); (d) the influence that the existence of a controlling shareholder had on the special committee's negotiating stance (¶¶ 118 and 124); and (e) the fact that attempts were made to find other bidders (¶ 120(a)).

15.     Similarly, in *Re Trina Solar Limited* (Unreported, 23 September 2020), Ex. 6, the Grand Court of the Cayman Islands, in determining fair value by only assigning a 45% weighting

to deal price, considered conduct-related factors such as: (a) a member of the Special Committee: (i) having not applied his mind "to what action was required as part of a proper process to ensure that potential competing bidders were encouraged and given an adequate opportunity to participate," and (ii) having "failed carefully to review the treatment of strategic buyers or test in any way the adequacy of the steps proposed and taken by Citi to obtain competing interest and bids and was content to leave all important decisions" to someone else (¶ 161); (b) the infrequency of Special Committee meetings and the Special Committee's poor record-keeping (¶¶ 162 and 163(f)); (c) the Special Committee's failure to conduct a comprehensive pre-market signing check by failing to properly consider and/or by excluding the company's major competitors as potential strategic buyers, or at least to take advice on the issue (¶ 163); (d) the Special Committee's conduct in negotiating and signing-off on the deal price with the buyer group (¶ 164 to 165); and (e) the manner in which conflicts were managed (¶ 178 to 180).  Having considered such conduct and process related factors, the Grand Court of the Cayman Islands concluded that "the performance of the Special Committee was deficient in a number of material respects . . . . The problems with the merger process which I have found to exist need to be taken into account when deciding what weight to give the Merger Price in the Court's fair value determination…" (¶ 181).

16.     The Cayman Islands Court of Appeal ("CICA") recently issued its appellate decision in the *Trina* matter.  *Re Trina Solar Limited*, CICA (Civil) Appeal No. 009 of 2021, dated May 4, 2023 (Ex. 18).  A number of important points arise from the CICA's decision.   First, the CICA emphasized the importance of broad-ranging discovery in a merger appraisal case.   In particular, it held that:

> In order to determine fair value, the court needs to have all the relevant information. This will include, amongst other matters, . . . generally all communications with the financial advisers employed

> by the special committee. . . . All of this information will primarily
> be in the hands of the company and its financial advisers.

*Id.* ¶¶ 255–56.  As I mentioned above, the Grand Court in *Re Trina Solar* relied on deal process

related factors when assessing what weight to give the company's merger price when determining

fair value.  The CICA upheld the Grand Court's reliance on deal process evidence and emphasised

that an analysis of deal process is necessary to determine "which weight can be placed on the

merger price as evidence of fair value."  *Id.* ¶ 137.  In particular, the CICA held that discovery as

to deal process is even more important where there is the potential for asymmetry of information

between the buyer and minority shareholders, such as in a management buyout:

> In such circumstances, there must, in my judgment, be heightened
> scrutiny in order to ensure that there is a realistic and fair
> opportunity for alternative bidders. Inevitably, in a management
> buyout, there is considerable scope for management to acquire the
> company on the cheap because of their detailed knowledge of the
> company as compared with the knowledge of ordinary shareholders
> and other potential bidders.
>
> [I]t is of fundamental importance, particularly in a management
> buyout, that companies give full disclosure of all documents relating
> to the sale process (including the market check) and the relevant
> communications with the financial advisers.

*Id.* ¶¶ 140, 145.  That is particularly relevant here, where the Company was taken private in a deal

with its majority shareholder.

## III.    Respondent and the Discovery Sought

17.    I believe the Respondent is likely to have information relevant to the fair value of

the Dissenting Shareholders' shares in Myovant in two principal ways.  First, Respondent is likely

to have information relevant to the valuation of Myovant by virtue of its relationship as Myovant's

commercial partner.  Second, Respondent is likely to have information relevant to the deal process

followed in relation to the Merger as there is a strong likelihood that Respondent is the "large

pharmaceutical company" identified as "Company A" in the Proxy Statement that considered a potential alternative transaction with Myovant.

18.     The Respondent is likely to have information relevant to the value of Myovant due to its close commercial relationship with Myovant.   In December 2020, Myovant and the Respondent agreed to jointly develop and commercialise Relugolix under the brand name Orgovyx[3] for use in the treatment of adult patients with advanced prostate cancer.   The Respondent's press release announcing and detailing this joint venture is attached as Exhibit 3 to the Declaration of Duane L. Loft.   Subject to obtaining regulatory approval, Myovant and the Respondent agreed to jointly develop and commercialise a Relugolix combination tablet for use in women's health in the United States and Canada.   The Respondent's 2020 Announcement also explained the following: (i) the Respondent and Myovant will equally share profits and certain expenses for Orgovyx and the Relugolix combination tablet; (ii) Myovant will receive up to $4.2 billon, including an upfront payment of $650 million, $200 million in potential regulatory milestones for FDA approvals for the Relugolix combination tablet, and tiered sales milestones upon reaching certain thresholds up to $2.5 billion in net sales; and (iii) if the Respondent exercises the option to commercialise Relugolix in oncology outside of the United States and Canada (excluding certain countries in Asia), Myovant will receive $50 million and be entitled to receive double-digit royalties on sales.

19.     The Relugolix combination tablet, under the brand name Myfembree, subsequently received the following approvals from the FDA: (i) approval in May 2021 for use in the

---

[3] Orgovyx had received approval in the United States from the Food and Drug Administration ("FDA") in December 2020 for the treatment of adult patients with advanced prostate cancer – *see* Myovant's Corporate Updates and Financial Results announced on 26 October 2022 a true and correct copy of which is produced as Exhibit 25 ("Myovant's October 2022 Financial Results").

management of heavy menstrual bleeding associated with uterine fibroids in pre-menopausal women; and (ii) approval in August 2022 for use in the management of moderate to severe pain associated with endometriosis.[4]

20.     It is clear from the information set out above, that the Respondent's Collaboration with Myovant represented a significant commitment.  Indeed, Myovant's October 2022 Financial Results indicate that almost 100% of Myovant's total revenue was derived from this collaboration.

21.     As a consequence of the Respondent's collaboration with Myovant, and the size and nature of the Respondent's investment, the Respondent will have developed a detailed understanding of Myovant's business and products.  It seems highly likely that the Respondent would have had extensive access to Myovant's internal documents and other information which would have included (among many others) access to valuation-relevant information such as sales projections and forecasts for Orgovyx and Myfembree, and information on pending and actual FDA approvals (for example in relation to the anticipated FDA application in relation to the Relugolix combination tablet for women) which will be directly relevant, and highly material, to Myovant's projected revenues and future prospects and therefore to Myovant's value.  It is, I suggest, entirely reasonable to infer that a highly sophisticated and leading global pharmaceutical company like the Respondent would have demanded, and would have been afforded, privileged access to a wealth of financial and product-related information, including at the time it was conducting due diligence into a potential partnership with Myovant and a proposed investment of billions of dollars and subsequently as it monitored the current and expected future performance of its investment.

---

[4] *See* Myovant's October 2022 Financial Results and Respondent's announcement dated 5 August 2022, a true and correct copy of which is produced as Exhibit 26.

22.     The Respondent will also have information on the nature and amount of the milestone payments that it is obliged to make to Myovant pursuant to the terms of their agreement, as referred to in the Respondent's 2020 Announcement. These include milestone payments for FDA approvals and tiered sales milestones. I believe that these payments will also be relevant to the valuation of Myovant.

23.     In relation to the deal process, I believe the Respondent was the potential purchaser referred to as "Company A" at pages 29 and 30 of the Proxy.  At pages 29 and 30 of the Proxy, the following references are made to Company A:

> On October 5, 2022, representatives of Goldman Sachs[5] and representatives of a third party ("Company A"), a large pharmaceutical company, discussed the public announcement and Company A informed Goldman Sachs that it was evaluating a possible transaction with Myovant.
>
> …
>
> Representatives of Goldman Sachs reported on a call they had with representatives of Company A, noting that Company A was evaluating a potential transaction with Myovant, but that Company A did not believe it likely that it would propose a transaction given that Sumitovant and SMP had publicly stated that Sumitovant was not willing to sell its Myovant shares and would not support an alternative merger, consolidation or similar transaction with a third party involving Myovant.
>
> …
>
> Also on October 11, 2022, Company A informed representatives of Goldman Sachs that after carefully considering the opportunity for a potential transaction with Myovant and discussing the opportunity internally, Company A had determined that it would not submit a proposal for a transaction with Myovant.

---

[5] Goldman Sachs was appointed as financial advisor to the Special Committee of Myovant's Board that was established to "oversee matters relating to a possible proposal from Sumitovant and SMP".  *See* Proxy pages 25-26.

24.     Given its close relationship and familiarity with Myovant, I believe that it is highly likely that the Respondent is the "large pharmaceutical company" identified in the Proxy.  At page 28 of the Proxy, it is noted that the Special Committee acknowledged that "few partners other than one of Myovant's current commercial partners would be interested in a transaction."  Additionally, the Respondent was incentivized to consider a transaction with Myovant due to its preexisting commercial relationship with Myovant and the synergies that would result from a merger with Myovant.  For example, under the terms of the joint venture between the Respondent and Myovant, the Respondent was obligated to make ongoing milestone payments to Myovant.  Therefore, if the Respondent completed a transaction with Myovant, the Respondent would effectively be buying back its own risk.

25.     Assuming, as I believe to be the case, the Respondent is in fact the Company A described in the Proxy, the Respondent is likely to have complied information in relation to the value of Myovant when it was evaluating, in early October 2022, a potential transaction with Myovant.  These valuation materials are likely to be highly relevant to the Bermuda Supreme Court's determination of the fair value of the Dissenting Shareholders' shares in Myovant, particularly as the Respondent – a leading global pharmaceutical company – is likely to have applied its special industry expertise and its extensive knowledge of Myovant when arriving at its valuation.

26.     The Respondent is therefore likely to have documents and information related to its involvement in the deal process as a potential purchaser.  This information is likely to assist the Bermuda Supreme Court in assessing the fairness of the deal process by reference to the factors identified in the Cayman caselaw discussed above.  Ultimately, this will assist the Bermuda

Supreme Court in determining the weight that should be attached to the deal price in its determination of fair value.

27.     I believe it to be clear therefore that the categories of discovery (summarised below) sought by Petitioner from the Respondent are thus highly relevant to the Bermuda Supreme Court's determination of fair value.

## IV.     Directions Order and Ruling

28.     Bermuda's Rules of the Supreme Court 1985 ("RSC") govern various aspects of court procedures in civil matters in Bermuda.  The rules applicable to discovery in Bermuda civil proceedings are set out in RSC Order 24.  RSC Order 24, rule 3(1) sets out the parameters for what is known in Bermuda as "general discovery".  This means providing discovery of all documents *"which are or have been in [a party's] possession, custody or power relating to any matter in question in the cause"*.  Ordinarily, parties to Bermuda proceedings are required to provide general discovery.  Parties are not obliged to produce documents from third parties that are not otherwise in their own *"possession, custody or power*."  As detailed below, the Bermuda Supreme Court has ordered the Company to provide general discovery in the Appraisal Proceeding. "This rule establishes the requirement for extensive disclosure of documents which is reinforced by the "*train of enquiry"* principle, which stems from a long-standing and well-regarded decision of the English Court of Appeal in *Compagnie Financière et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55 (generally referred to by lawyers and judges as "*Peruvian Guano*") which has been approved and followed in several Bermuda cases.[6]  In *Peruvian Guano*, Lord Justice Brett held as follows:

---

[6]     *See Walsh and Taal v Horizon Bank International Ltd,* BM 2008 SC 4*; Modulable et Al v Butterfield Trust (Bermuda) Ltd* BM 2013 SC 45*; Terceira v Terceira et Al* BM 2010 SC 58 and

I think it obvious from the use of these terms ["a document relating to any matter in question in the action"] that the documents to be produced are not confined to those, which would be evidence either to prove or to disprove any matter in question in the action … The doctrine seems to me to go farther than that … It seems to me that every document relates to the matters in question in the action, which not only would be evidence upon any issue, but also which, it is reasonable to suppose, contains information which may – not which must – either directly or indirectly enable the party … either to advance his own case or to damage the case of his adversary. I have put in the words "either directly or indirectly", because, as it seems to me, *a document can properly be said to contain information which may enable the party requiring the affidavit either to advance his own case or to damage the case of his adversary, if it is a document which may fairly lead him to a train of inquiry, which may have either of these two consequences.* (at page 62 to 63) (emphasis added).

29.     In addition to general discovery, RSC Order 24, rule 7 provides that parties may seek "specific discovery" to supplement general discovery.

30.     The RSC apply in all relevant respects to appraisal proceedings in Bermuda, including in relation to the discovery process.   The Bermuda Supreme Court has recently considered the approach to discovery in appraisal proceedings in both *Jardine Strategic Holdings Limited* [2021] SC (Bda) 87 ("*Jardine*") and latterly in its ruling on directions handed down on 25 August 2023 in the Appraisal Proceeding ("Directions Ruling").[7]   In the Directions Ruling, at paragraph 29, the Chief Justice of the Bermuda Supreme Court found that "the considerations which apply to section 106 proceedings … necessitate that the company, as a general rule, should be required to provide general discovery of all documents and information which are relevant to

_____

the notes to RSC Order 24, r.1(1) in the 1999 "White Book". (The commentary in the 1999 White Book is often referred to in Bermuda as in practice it is the most "recent" commentary on the RSC. The RSC are derived from the English Rules of the Supreme Court which were replaced in England by the Civil Procedure Rules in 1999.)

[7] *Myovant Sciences Ltd* [2023] SC (Bda) 67, Ex. 22.

the issue of the fair value." Accordingly, the Company has been ordered to provide general discovery in the Appraisal Proceedins. In *Jardine*, on the other hand, the "Court declined to make a general discovery order … on the basis that it was a wholly exceptional case" (paragraph 22 of the Directions Ruling). The rationale for the decision in *Jardine* can be found at paragraphs 74-76 of the judgment where, *inter* alia, the Court noted "that this is a wholly exceptional business enterprise in terms of its size and the complexity of the structure". Instead, the Court ordered discovery of particular document categories, afforded the parties the right to come back for further specific discovery and provided that the valuation experts could submit requests for information.

31.    As part of the Appraisal Proceeding, the parties prepared for a "Directions Hearing." Prior to that hearing, the parties submitted sequential "skeleton arguments" to the Bermuda Supreme Court, which, *inter alia*, set forth the parties' arguments related to the scope of discovery. A true and correct copy of Dissenting Shareholders' skeleton argument, dated July 4, 2023, is attached hereto as Exhibit 24. A true and correct copy of the Company's skeleton argument, dated July 11, 2023, is attached hereto as Exhibit 25. A true and correct copy of the Dissenting Shareholders' Reply skeleton argument, dated July 14, 2023, is attached hereto as Exhibit 26.

32.    One of the main points of contention at the Directions Hearing was the scope of discovery to be provided by the Company in the Appraisal Proceeding. The Dissenting Shareholders argued that the Court should require the Company to provide "general discovery", i.e. access to all documents in the Company's possession, custody or power relevant to the determination of the fair value of the Dissenting Shareholders' shares in the Company. The Company, on the other hand, argued for an "*expert-led*" process in which the Company would initially produce a limited set of documents, including certain valuation materials and minutes of

Board meetings.  However, any other documents would have to be requested by the Dissenting Shareholders' valuation expert.  *See* Ex. 25 at ¶ 12.  In support of this argument, the Company placed heavy reliance on the earlier decision in *Jardine* where, as explained previously, general discovery was not ordered.

33.     The Bermuda Supreme Court held the two-day Directions Hearing on July 18-19, 2023.  A true and correct copy of the transcript of the first day of the Directions Hearing is attached hereto as Exhibit 27.  A true and correct copy of the transcript of the second day of the Directions Hearing is attached hereto as Exhibit 28.  (These copies of the transcript contain corrections agreed to by the parties to the Appraisal Proceeding.)

34.     On August 25, 2023, the Bermuda Supreme Court handed down its Ruling from the Directions Hearing ("Directions Ruling"), in which it found in favor of Dissenting Shareholders on the issue of general discovery.  A true and correct copy of the Directions Ruling is attached hereto as Exhibit 22.  The Court summarized the main disagreement between the parties:

> The Company opposes that the Court should make any order requiring the Company to provide general discovery in relation to documents which may be relevant to the issue of the fair valuation of the shares. The Company contends that such an exercise is unnecessary. Instead, it proposes an expert-led process under which the experts review all relevant publicly available information and other transactional material which the Company may be prepared to provide to the experts. Thereafter, the experts request from the Company and/or the Plaintiffs such further documents as they reasonably require.

Ex. 22 ¶ 2.  The Court rejected the Company's proposed approach to this issue and ordered the Company to provide general discovery.  In so doing, the Court declined to follow the exceptional approach adopted in *Jardine*.

35.     The Court ordered the Company to provide all documents "within the Company's possession, custody or power created since October 2019 which are relevant to the determination of the fair value of the Plaintiffs' shares in the Company as at the valuation date." *Id.* ¶ 29.

36.     This requirement is reflected in paragraph 29 of the Bermuda Supreme Court's Order for Directions:

> Within 180 days of this Order, the Defendant shall upload to the Data Room, all Documents (as defined in Appendix 1) within the Defendant's possession, custody or power created since October 2019 which are relevant to the determination of the fair value of the Plaintiffs' shares in Myovant as at the Valuation Date (as defined at paragraph 14).

37.     The Court in its Directions Ruling also provided the following guidance to the Company in relation to general discovery - "the Company should seek to comply with the requests set out in Appendix 2 to the previous draft of the Directions Order provided by the Plaintiffs."  Ex. 22 ¶ 30.  The provision of this guidance was noted in the fourth recital to the Order for Directions. One of the categories identified in Appendix 2 concerns communications between the Company and any other potential purchaser.[8]  It is therefore envisaged by the Bermuda Supreme Court that the Company's documents related to Respondent's interest in acquiring Myovant will form part of its general discovery.

**V.      Respondent Is Not a Party to the Appraisal Proceeding**

38.     The Bermuda Supreme Court can only compel a non-party to produce evidence or testify at trial (through a *subpoena duces tecum* or a *subpoena ad testificandum*, respectively) if the non-party is within its jurisdiction.  RSC Order 32 rule 7, Ex. 8.  The Bermuda Supreme Court

---

[8] Appendix 2, paragraph 4 provides "To the extent that the Company (including the Special Committee or its advisors) had any communications with any other party who was a potential purchaser in respect of the Merger, all Documents sent to or received from such potential purchaser and/or its advisors and/or its financiers."

does not have the authority to compel non-parties who are not subject to its jurisdiction to produce evidence or discovery.  Here, Respondent is not a party to the Appraisal Proceeding.  Further, I understand that Respondent is headquartered in New York.  Accordingly, Respondent is outside the jurisdiction of the Bermuda Supreme Court.  In the absence of jurisdiction, the Bermuda Supreme Court is powerless to direct Respondent to produce evidence or discovery in the Appraisal Proceeding.  Therefore, absent assistance from this Court via Section 1782, Petitioner will not have a practicable pathway to obtain any discovery directly from Respondent in a timely manner.

39.    For the sake of completeness, I wish to note that the Bermuda Supreme Court is permitted to issue a letter of request or "Letter Rogatory" under a procedure akin to that under the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, seeking the assistance of the foreign court, including an order to compel a non-party witness to be examined.  However, such applications are of limited utility in practice.  The process is cumbersome, time-consuming, and unduly restrictive.  For example, the party making the application is not entitled to discovery as permitted under Section 1782 but is instead restricted to seeking specific and identifiable evidence for use at trial.  As one English case put it, "the letter of request must be confined to particular documents, although these may be described compendiously ...."  *See Panayiotou v. Sony Music Entertainment (UK) Ltd*, [1994] Ch. 142 (1993), Ex. 9 at page 153.

40.    Most litigants, like Petitioner, do not have sufficient knowledge about the discovery in the possession of a target to formulate a request with the required specificity.  Two cases from the Bermuda Supreme Court have also made it clear that the "Letter Rogatory" process is not for the purpose of obtaining discovery.  *See NetBank v. Commercial Money Centre* [2004] Bda L.R.

46, Ex. 10, and *The Patriot Group, LLC v. Hilco Financial, LLC and others* [2015] Bda L.R. 46,

Ex. 11. A similar process exists in the Cayman Islands, yet I understand that Cayman Islands

litigants who seek to obtain evidence in the United States do not usually follow that route. I

understand that they instead generally use Section 1782. Just like in the Cayman Islands, there is

no requirement under Bermuda law that a litigant has to resort to a Letter Rogatory process before

filing a Section 1782 application with a court in the United States. In my experience, it is more

common for litigants in Bermuda to use Section 1782 to obtain evidence located in the United

States. This is a route that is often used by liquidators of Bermuda companies, where the

promoters, managers, and other service providers are located in the United States. Therefore, the

availability of a Letter Rogatory procedure does not bar Petitioner from filing this Application.

## VI.   Bermuda Courts Are Receptive to Evidence Obtained Through Section 1782

41.     Based on my professional experience as a Bermudian lawyer and my understanding

of case precedents and court practices in Bermuda, England, and the Cayman Islands, I believe

that the Bermuda Supreme Court will be receptive to evidence obtained through Section 1782.

The Bermuda Supreme Court expects the parties to proceedings to obtain the evidence they believe

is necessary to prosecute their case. Thus, there is no requirement to obtain permission from the

Bermuda Supreme Court before seeking relevant non-party evidence abroad, including through

Section 1782.

42.     For example, in 1987, the House of Lords (then the highest court in the United

Kingdom, subsequently replaced by the UKSC), expressly considered in *South Carolina Insurance

Co. v. Assurantie Maatschappij* [1987] A.C. 24, Ex. 12, whether a litigant in an English legal

proceeding could seek evidence located in the United States pursuant to Section 1782. In that case,

two defendants to English court proceedings had submitted an application under Section 1782 in

the United States District Court for the Western District of Washington, seeking discovery of documents from two non-parties to support their defense in those English proceedings. Lord Brandon, delivering a unanimous judgment for the House of Lords, rejected (at page 42) the plaintiffs' suggestion that the defendants had acted improperly or that the English court should issue an injunction prohibiting defendants from pursuing the Section 1782 discovery:

> I cannot see that the [defendants], by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case.

43.    The English rule, articulated in *South Carolina Insurance Co.*, granting litigants in English legal proceedings the freedom to seek evidence from outside the country, including under Section 1782, has been consistently applied by later English decisions. For example, in 2018, the English High Court, citing *South Carolina Insurance Co.*, reaffirmed that "[i]n general, the English court leaves it to the parties to obtain the evidence they think necessary for the advancement of their case by the means of their choosing, provided such means are lawful in the country where they are deployed." *Dreymoor Fertilisers Overseas Pte Limited v. Eurochem Trading Gmbh & Ors* [2018] EWCH 2267 (Comm), Ex. 13 at 11. The most recent decision of an English Court in relation to a Section 1782 application is *Walter Tzvi Soriano v (1) Forensic News LLC (2) Scott Stedman [2023]* EWHC 262 (KB) which, again, concerned an application for an anti-suit injunction to restrain a Section 1782 application. In dismissing the application for the anti-suit injunction, the Court held that there was nothing in the Section 1782 application that was *"oppressive, vexatious, or otherwise unconscionable"* and nor was there any prospect of *"the 1782 Application interfering with the due progress of the English proceedings"*. As explained above,

decisions of the House of Lords are generally considered to be de facto binding on the Bermuda Supreme Court and thus are followed.

44.     I accordingly believe the Bermuda Supreme Court would agree with and adopt the approach of the English Courts concerning Section 1782 discovery, as articulated in the *South Carolina Insurance Co* and *Dreymoor Fertilisers* cases.  Further, while the Bermuda Supreme Court has never directly ruled on the issue, it has in at least one instance noted the practice of litigants in Bermuda seeking discovery in the United States under Section 1782, and in another, has admitted evidence obtained under Section 1782.  First, in the case of *Apex Fund Services Ltd and anor. v Matthew Clingerman and anor* [2019] SC (Bda) 74 Corn, Ex. 14 ¶ 54, the Bermuda Supreme Court expressly noted that "[n]o dispute turns on the powers conferred on a litigant under §1782 to obtain evidence for use in proceedings outside of the United States."  Second, in *Hiscox v. Yuval Abraham (2018) Bda L.R.* 88, Ex. 15, the Bermuda Supreme Court accepted into evidence documents that had been obtained from a non-party based in the United States, pursuant to a Section 1782 application granted by the Southern District of New York.  These authorities are consistent with my understanding that courts in Bermuda will follow English precedents and be receptive to evidence that Petitioner is seeking through this Application.

45.     I furthermore understand that Cayman Islands courts also have accepted evidence obtained in the United States under Section 1782, both generally and in appraisal cases.  Indeed, the Cayman Islands Court of Appeal ("CICA") in *Lyxor Asset Management S.A. v. Phoenix Meridian Equity Limited* [2009] CILR 553, Ex. 16, expressly affirmed a party's right to obtain full discovery, including both pre-trial deposition testimony and documents, through Section 1782.  Importantly, the CICA in *Lyxor* cited to and relied on the House of Lords' decision in *South Carolina.*, Ex. 12, as discussed above.  The *South Carolina*  decision is de facto binding in the

Cayman Islands for the same reasons (discussed in paragraph 22 above) that it is in Bermuda. According to the CICA in *Lyxor* (Ex. 16 ¶ 57), the right to seek discovery under Section 1782 "is a right conferred by US law—it is not a right conferred by, or to be withheld under, Cayman law." The CICA ruled that because a party has a right to avail itself of a legitimate foreign evidence-gathering process, such as Section 1782, a compelling reason (for example, when a party is acting oppressively) is required to deny the party the right to pursue discovery by those means.

46.     As a corollary, I am aware of no Bermudian law or court ruling prohibiting a party in Bermudian legal proceedings from acquiring or using evidence obtained via Section 1782.  Any evidence obtained by Section 1782 is not inadmissible as a result of the manner in which it has been obtained.  The Bermuda Supreme Court will make a final admissibility determination at trial based upon generally applicable rules governing admissibility irrespective of the source of the evidence.  It follows that the Bermuda courts are, as a general proposition, receptive to the judicial assistance offered by the application of Section 1782, and I believe the Bermuda Supreme Court will be in the present case where the requested discovery sought in the Application pertains to the process by which the Company and Buyer formulated, evaluated, negotiated, and approved the Merger (and the Merger Price), and the valuations and other advice relied on by the Company, the Buyer, and their respective financial advisors.

## VII.     Admissibility of Evidence

47.     As regards to deposition testimony, the Bermuda Supreme Court's approach is the same as that of the Cayman courts as stated in *Lyxor*.  The Cayman court observed there that the ultimate admissibility of transcripts of depositions taken under United States law was irrelevant to determining whether to allow the deposition to proceed.  Instead, the *Lyxor* court explained that admissibility would be a question for a later date:

> The use to which the transcripts of depositions taken in New York may be put in the Cayman proceedings is, of course, a matter for the Grand Court. … no transcript of depositions would be admissible as evidence at trial without an order of the Grand Court. In deciding what order to make in this respect, it will be open to the Grand Court to restrict the use which can be made of the deposition transcripts in the course of any cross-examination of Mr. Rosenberg and Mr. Phlipponneau at the trial.

Ex. 16 at ¶ 47.

48.     Here, Petitioner seeks to depose a corporate representative of the Respondent.  The resulting deposition transcript may be admissible as hearsay statements under Bermuda law although notices may be required under the applicable provisions of Part IIA of the Evidence Act 1905.   In short, consistent with Bermudian law and the persuasive value of *Lyxor*, the Bermuda Supreme Court is receptive to entertaining a transcript of a deposition taken under Section 1782 just as it is in relation to a transcript of testimony from another forum.

## VIII.   Overview of Petitioner's Requests

49.     Petitioner seeks tailored discovery from the Respondent on issues relevant to the Appraisal Proceeding.  These include: (i) documents concerning the Respondent's collaboration with Myovant, including sales forecasts and revenue projections for Orgovyx and Myfembree, and details of milestone payments due in relation to FDA approvals and sales volumes; (ii) documents concerning the Respondent's analysis and consideration of a potential transaction with Myovant and the detailed reason(s) for its decision not to move forward with such a transaction; and (iii) valuation materials concerning Myovant prepared by the Respondent in contemplation of potential transaction with Myovant ("Requested Discovery").

50.     The Requested Discovery will be used to assess the fairness of the deal process that resulted in the Merger.  This in turn, will assist the Bermuda Supreme Court in determining the appropriate weight to attach to the deal price.  The Requested Discovery will also be used to assess

the value of Myovant more generally.  In this regard, I believe the documents arising from the Respondent's Collaboration with Myovant will be of particular assistance to the Bermuda Supreme Court.

51.     I believe it is clear therefore that the Requested Discovery will significantly assist the Bermuda Supreme Court in its primary task in the Appraisal Proceeding, which is to determine the fair value of the Dissenting Shareholders' shares in the Company.

Executed in Hamilton, Bermuda, this 8th day of January 2024:

Mark Chudleigh